DANIEL G. BOGDEN
United States Attorney
KISHAN NAIR
Assistant United States Attorney
333 Las Vegas Boulevard So., Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336 / Fax: (702) 388-6698

FILED

2010 OCT 29 PM 2: 13

U.S. MAGISTRATE JUDGE
BY_____

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

-oOo-

UNITED STATES OF AMERICA,

. PLAINTIFF,

vs

NICHOLAS GHAFOURIA,
SCOTT THOMPSON,
KIMBERLY CRAWFORD,
KI YONG PARKER,
DEMETHA L. BROWN JACKSON,
JACOB MCLAUGHLIN,
TAYLOR HILL, and
ANDREY ARIZA,

DEFENDANTS.

2: 10cR 547

Case No.    2:10-mj-00838 PAL

**COMPLAINT**

18 U.S.C. Section 1956(h) – Money
Laundering Conspiracy; and
21 U.S.C. Sections 846 and 841(a)(1) and
(b)(1)(C)- Conspiracy to Distribute
Oxycodone.

BEFORE the United States Magistrate Judge, Las Vegas, Nevada, the undersigned Complainant, being duly sworn, deposes and states:

### COUNT ONE
Conspiracy to Launder Monetary Instruments

That beginning on a date unknown, but by at least July 2009, and continuing up to and including October 2010, in the State and Federal District of Nevada,

**Nicholas GHAFOURIA,**
**Scott THOMPSON,**
**Kimberly CRAWFORD,**
**Jacob MCLAUGHLIN**
**Taylor HILL, and**
**Andrey ARIZA,**

defendants herein, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and

agree with others known and unknown to your Complainant to commit an offense against the United States in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), by knowingly conducting and attempting to conduct a financial transaction affecting interstate commerce, specifically, conducting banking transactions including depositing monetary instruments into bank accounts controlled by defendants and others, involving financial transactions of approximately $1,221,186 in United States currency, which were proceeds of a specified unlawful activity, that is namely, proceeds earned from violations of Title 21, United States Code, Section 841 and 846, knowing that the transactions were designed in whole and in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, defendants knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(1)(B)(i).

## COUNT TWO
### Conspiracy to Distribute Oxycodone

That beginning on a date unknown, but by at least July 2009, and continuing up to and including October 2010, in the State and Federal District of Nevada,

**Nicholas GHAFOURIA,**
**Scott THOMPSON,**
**Kimberly CRAWFORD,**
**Ki Yong PARKER,**
**Demetha L. Brown JACKSON, and**
**Jacob MCLAUGHLIN,**

the defendants herein, did knowingly, intentionally and unlawfully combine, conspire, confederate and agree with others known and unknown to your Complainant, to distribute Oxycodone, which is a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and 846.

. . .

2

1.    Your Complainant is a Special Agent with the Internal Revenue Service Criminal Investigation ("IRS-CI") and has been so employed in this capacity since September 2000. Your Complainant possesses a bachelor's degree in accounting and has received extensive training in financial investigative techniques. Your Complainant is currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") and the High Intensity Drug Trafficking Area Task Force ("HIDTA") at the Las Vegas Office of the Drug Enforcement Administration and has been since October 2006. Your Complainant has conducted numerous investigations relating to violations of the internal revenue laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the money laundering statutes (Title 18, United States Code, Sections 1956 and 1957), and related offenses.

2.    Your Complainant is presently involved as the co-case agent in an ongoing criminal investigation of Nicholas GHAFOURIA (GHAFOURIA), Scott THOMPSON (THOMPSON), Taylor HILL (HILL), Andrey ARIZA (ARIZA), Ki Yong PARKER (PARKER), Demetha L. Brown JACKSON (JACKSON), Jacob MCLAUGHLIN (MCLAUGHLIN), Kimberly CRAWFORD (CRAWFORD), and others possibly known and unknown, regarding violations of Federal drug trafficking and money laundering laws. This investigation commenced in approximately February of 2010, and is ongoing. Your Complainant is being assisted by the Drug Enforcement Administration, the Federal Bureau of Investigation, and the Las Vegas Metropolitan Police Department.

3.    Based on your Complainant's training and experience in conducting financial investigations involving drug traffickers and other individuals involved in illegal activity, your Complainant is familiar with the methods and practices used by individuals and organizations involved in financial crimes and illicit activities that generate large amounts of income. These methods include cash purchases, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal their activities, and the structuring of financial transactions

3

in a manner to avoid Federal reporting requirements by financial institutions. Your Complainant has experience in debriefing defendants, participant witnesses, informants, and other persons who have had personal experience and knowledge of amassing, spending, converting, transporting, distributing, and concealing profits from illegal activities.

4. Unless stated otherwise, your Complainant has personal knowledge of the matters set out in this complaint. To the extent that any information in this complaint is not within my personal knowledge, it was made known to me through my own review of records provided by financial institutions and interviews of witnesses, and through reliable law enforcement sources, including discussions with other law enforcement agents, which has caused me to believe the information to be true.

I.

## MODUS OPERANDI OF DRUG TRAFFICKERS

5. Your Complainant has had experience, training, and communications with law enforcement personnel who specialize in the area of documentation and detection of proceeds from drug trafficking. Your Complainant also has experience in debriefing defendants and sources of information ("SOIs") as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal knowledge regarding the methods of transportation and distribution of the drugs and money in large scale controlled substance distribution operations.

6. Based on your Complainant's training and experience, your Complainant knows the following:

a. That drug traffickers earn large sums of money and often try to legitimize these large sums of money. In order to do this, narcotics traffickers attempt to secrete, transfer, and conceal the money by placing assets in names other than their own, to include corporate names and nominee names, to avoid detection while maintaining control.

b. That drug traffickers operate "front businesses" or nominee corporations which

appear legitimate on paper, but are actually used to legitimize drug proceeds and give the drug traffickers an alibi to law enforcement as to the source of their funds used to purchase assets.

## II.

## PRESCRIPTION DRUG OVERVIEW AND SUMMARY

7.    The controlled substance involved in this investigation is Oxycodone. It is also known by its brand names, OxyContin and Roxicodone. Oxycodone is a generic name for a narcotic analgesic classified under Federal law as a Schedule II narcotic drug controlled substance. Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain and can be habit forming. An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time because of its addictive nature. Oxycodone comes in a variety of milligrams but the most commonly abused dosage units in Las Vegas, Nevada are the 30mg and 80 mg tablets of oxycodone. Roxicodone and OxyContin are some of the brand names of oxycodone that are the most commonly abused, diverted and sold illegally for profit. Roxicodone tablets can be prescribed in 30mg tablets of oxycodone and OxyContin tablets can be prescribed in 80mg tablets of oxycodone. When oxycodone 30mg and 80mg tablets are obtained from legitimate pharmacies, they can cost approximately two dollars ($2.00) to twenty dollars ($20.00) per tablet. The price per tablet fluctuates between pharmacies and the quantity of oxycodone purchased. A customer's out of pocket expense when purchasing 30mg and 80mg oxycodone depends on if insurance is used or if the prescription is purchased in full without the use of insurance. Oxycodone 30mg and 80mg tablets, when sold for illegitimate purposes, can net anywhere from $30 to $50 per tablet of oxycodone 30mg and $70 to $140 per tablet of OxyContin 80mg. These prices are usually obtained when the oxycodone is sold outside the district of Nevada.

8.    Your Complainant knows based upon his training and experience that diverted pharmaceuticals, particularly oxycodone in both 30mg and 80mg, are frequently abused and have

5

become extremely popular with members of the community, particularly youth. In addition, the ease of availability and profit margin of these narcotics has made Las Vegas a source city for the illegal acquisition of prescription drugs by tourists, people in nightclubs, and illegal drug dealers and users throughout the Las Vegas area community.

9.     Based on your Complainant's training and experience, your Complainant knows:

a)     Individuals that sell and distribute prescription drugs, specifically oxycodone 30mg and 80mg tablets, often obtain monthly prescriptions in their own name from a doctor and then sell the prescription pills once filled at a pharmacy for profit. Obtaining prescription drugs in the drug trafficker's own name gives the drug trafficker an alibi if ever approached and/or contacted by law enforcement while in possession of the prescription drug the drug trafficker is attempting to sell for profit.

b)     Individuals that sell and distribute prescription drugs, specifically oxycodone 30mg and 80mg tablets, often amass and purchase other individuals prescription pills obtained from their monthly doctor visits. The drug trafficker is aware of the large profit potential of obtaining prescriptions drugs locally in Las Vegas, NV, and distributing to areas outside Las Vegas where oxycodone is not as easily obtained. Therefore, the drug trafficker attempts to amass as many prescription drugs as possible locally in Las Vegas, NV, specifically oxycodone 30mg and 80mg, to supply their distribution destination.

c)     Individuals that sell and distribute prescription drugs, specifically oxycodone 30mg and 80mg tablets, often engage in prescription fraud as a means to obtain additional prescription pills for distribution.

d)     Individuals that sell and distribute prescription drugs, specifically oxycodone 30mg and 80mg tablets, often engage in "doctor shopping" and "pharmacy shopping" in which the individual uses several different doctors and pharmacies to obtain oxycodone. The drug trafficker does this for several reasons. First, "doctor shopping" and "pharmacy shopping" can maximize the

6

amount of oxycodone that the drug trafficker can be prescribed. Second, "doctor shopping" and "pharmacy shopping" can reduce the suspicion of the doctor and pharmacist that a particular individual may be addicted or diverting the prescription drugs if the drug trafficker only goes to that particular doctor or pharmacy every couple of months.

### III.

### CO-CONSPIRATOR ROLES

10.    The following section provides a summary of each of the identified co-conspirator's roles in the drug trafficking and money laundering conspiracy headed by Nicholas GHAFOURIA in Las Vegas:

11.    Nicholas GHAFOURIA is located in Las Vegas, NV. He is the head of the GHAFOURIA drug trafficking organization (GHAFOURIA DTO), and has acquired thousands of tablets of oxycodone in Las Vegas, NV, and distributed the oxycodone to outside of Las Vegas. GHAFOURIA has conspired with the individuals listed below to distribute oxycodone to another state, and launder the drug proceeds earned in that state from the sale of oxycodone through nine (9) Las Vegas based Wells Fargo Bank accounts (hereinafter referred to as TARGET BANK ACCOUNTS). GHAFOURIA is the authorized signer on four (4) Wells Fargo Bank accounts. GHAFOURIA has one (1) Wells Fargo Bank account (identified in this complaint as X7063) in his name, and three (3) Wells Fargo Bank accounts in the name of ALLEY RAT (identified in this complaint as X0538, X0868, and X0939). Your Complainant has attached to this complaint and hereby incorporates by reference Exhibit 1, which is a summary of the monthly cash deposits into the TARGET BANK ACCOUNTS from June 2009, through October 2010, showing a graphic chart comparison to the monthly known acquisition of oxycodone pills during the same time period by GHAFOURIA and one of his co-conspirators (PARKER). This exhibit shows a closely related pattern between the acquisition of oxycodone pills and the cash deposits. Your Complainant believes that Exhibit 1 is compelling summary evidence of GHAFOURIA and his

7

co-conspirators's pattern of illegal drug dealing and money laundering. GHAFOURIA's prior arrests include one in April of 2002, in which GHAFOURIA was arrested by Las Vegas Metropolitan Police Department (LVMPD) for conspiracy to commit 1st degree kidnaping, battery with substantial bodily harm, and robbery with a deadly weapon. GHAFOURIA plead guilty to conspiracy to commit a crime, as a gross misdemeanor, and was sentenced to a maximum of 12 months in jail and 3 years probation. All other charges in relation to this arrest were dropped. In May 2002, GHAFOURIA was arrested in North Las Vegas, NV, for robbery with a deadly weapon and conspiracy to violate the Uniform Controlled Substances Act. No disposition could be located for these charges. In April 2007, GHAFOURIA was arrested by LVMPD for battery domestic violence and the disposition shows the charge was denied. In July 2008, GHAFOURIA was arrested for possession of less than 1 ounce of marijuana, but no disposition of this charge could be found.

12.     Scott THOMPSON is located in Las Vegas, NV, and is a money launderer for the GHAFOURIA DTO. THOMPSON is the only authorized signer on three (3) Wells Fargo Bank accounts in the name of STEALTH BOYS (identified in this complaint as X0942, X7108, and X9848). Therefore, only THOMPSON can withdraw funds from these bank accounts. Numerous co-conspirators in another state have deposited drug proceeds from the sale of oxycodone into the STEALTH BOYS Wells Fargo Bank accounts. THOMPSON received cash deposits from another state into one of the STEALTH BOYS accounts beginning in November 4, 2009, and one of the STEALTH BOYS accounts continues to receive drug proceed deposits from another state in October 2010. Your Complainant believes the evidence in this complaint shows that after the drug proceeds are deposited into the STEALTH BOYS bank accounts, THOMPSON withdraws the drug proceeds and provides them to GHAFOURIA. THOMPSON is also part of the Conspiracy to Distribute oxycodone, as stated below.

13.     Kimberly CRAWFORD is located in Las Vegas, NV, and is a drug trafficker and

money launderer for the GHAFOURIA DTO. In November 2009, CRAWFORD was interdicted in Seattle, WA, carrying $10,880 in cash. CRAWFORD stated the cash was destined for GHAFOURIA. CRAWFORD has prior arrests. In December 2005, CRAWFORD was arrested for battery domestic violence by LVMPD in Las Vegas, NV. The disposition shows that this charge was denied. In November 2007, CRAWFORD was arrested for 1st degree kidnaping, robbery, robbery of a vulnerable person, and burglary. The disposition states that these charges were denied.

14.     Ki Yong PARKER is located in Las Vegas, NV, and is a drug trafficker for the GHAFOURIA DTO. PARKER has acquired known oxycodone prescriptions in her name beginning in September 2009, through September 13, 2010, and sells the oxycodone tablets to GHAFOURIA. GHAFOURIA has been to PARKER's residence as recently as October 4, 2010, and your Complainant believes the evidence in this complaint shows the contact was to exchange drugs/and or drug proceeds.

15.     Demetha L. JACKSON is located in Las Vegas, NV, and is a drug trafficker for the GHAFOURIA DTO. JACKSON acquires oxycodone from various sources in Las Vegas, NV, and sells the oxycodone tablets to GHAFOURIA. Surveillance agents have observed JACKSON as recently as October 4, 2010, arriving at ALLEY RAT2 to conduct a drug related transaction.

16.     Jacob MCLAUGHLIN is located in Las Vegas, NV, and has also been identified in another state during this investigation. MCLAUGHLIN is a drug trafficker and money launderer for the GHAFOURIA DTO. A package addressed to MCLAUGHLIN in another state was seized in Las Vegas, NV, and it contained 415 tablets of oxycodone. In addition, MCLAUGHLIN has deposited drug proceeds while he was in another state into HILL's bank account X9167, and THOMPSON's STEALTH BOYS bank account X0942. MCLAUGHLIN has prior arrests. In March 2007, MCLAUGHLIN was arrested by LVMPD for battery with a victim over 65 years old, battery on a police officer, resisting arrest, and auto burglary. MCLAUGHLIN

plead guilty to attempted burglary, a felony, and was sentenced to 12 to 36 months in prison and two years probation. In August 2010, MCLAUGHLIN was arrested by LVMPD in Las Vegas, NV, for the sale of a controlled substance. The disposition of this charge is still pending.

17. Taylor HILL is located in Las Vegas, NV, and is a money launderer for the GHAFOURIA DTO. HILL is the only authorized signer on one (1) Wells Fargo Bank account (identified in this complaint as X9167),and the account is in his name. Therefore, only HILL can withdraw funds from this bank account. Numerous co-conspirators in another state deposit drug proceeds from the sale of oxycodone into HILL's Wells Fargo Bank account. HILL received cash deposits from another state into his account beginning in September 28, 2009, and through to April 2, 2010. Your Complainant believes the evidence in this complaint shows that after the drug proceeds are deposited into HILL's bank account, HILL withdraws the drug proceeds and provides them to GHAFOURIA.

18. Andrey ARIZA is located in Las Vegas, NV, and is a money launderer for the GHAFOURIA DTO. ARIZA is the only authorized signer on one (1) Wells Fargo Bank account (identified in this complaint as X8748), and the account is in is name. Therefore, only ARIZA can withdraw funds from this bank account. Co-conspirators in another state deposit drug proceeds from the sale of oxycodone into ARIZA's Wells Fargo Bank account. ARIZA received cash deposits from another state into his account beginning in October 16, 2009, and through to October 27, 2009. Your Complainant believes the evidence in this complaint shows that after the drug proceeds are deposited into ARIZA's bank account, ARIZA withdraws the drug proceeds and provides them to GHAFOURIA.

IV.

## FACTS ESTABLISHING PROBABLE CAUSE FOR ARREST

19. In the following sections, your Complainant will detail an ongoing illegal drug trafficking organization headed by Nicholas GHAFOURIA that began in approximately June

10

2009. The evidence in this complaint shows GHAFOURIA and his co-conspirator, PARKER, have used prescriptions in their names to acquire approximately 4,425 tablets of oxycodone (80mgs), and 1,860 tablets of oxycodone (30mgs), and GHAFOURIA and his co-conspirators distribute the oxycodone tablets to co-conspirators in another state. GHAFOURIA has also obtained additional oxycodone from JACKSON for distribution to another state. Once the co-conspirators sell the oxycodone in various cities in another state, they deposit the drug proceeds in multiple Wells Fargo Bank branches located in the other state. Your Complainant has been able to establish that co-conspirators in another state have deposited from July 24, 2009, through October 2, 2010, approximately $1,221,186 in cash deposits into nine (9) Las Vegas Wells Fargo Bank based TARGET BANK ACCOUNTS controlled by GHAFOURIA and his co-conspirators. Initially, GHAFOURIA had his co-conspirators in another state deposit drug proceeds into a Wells Fargo Bank account in his name. Shortly after this, GHAFOURIA used HILL, ARIZA, and THOMPSON as nominees to obtain Wells Fargo Bank accounts in Las Vegas, NV, and allow out of state drug proceeds to be deposited into their Wells Fargo Bank accounts. Once the drug proceeds were deposited into the Las Vegas based Wells Fargo Bank accounts, the funds were withdrawn at Las Vegas Wells Fargo Bank branches by GHAFOURIA, HILL, ARIZA, and/or THOMPSON. These deposits and withdraws were the transfer mechanism used to get the drug sale proceeds from another state to Las Vegas. GHAFOURIA has attempted to legitimize his drug proceeds by operating a custom motorcycle and paint shop named "ALLEY RAT CUSTOM CYCLES". Your Complainant has probable cause to believe the actions, transactions, and overt acts committed by GHAFOURIA and his co-conspirators are violations of Federal drug and money laundering conspiracy statutes.

20.    Your Complainant will establish probable cause in this complaint from a chronologic listing of statements by witnesses, surveillance details, traffic stop details, package interdiction details, analysis of prescription records, a financial analysis of bank account records,

11

records, and other information detailed in this complaint. This complaint is based your Complainant's training and experience, the training and experience of other law enforcement officers with whom your Complainant has consulted, and information that your Complainant has obtained during the course of the investigation.

**Statements by Confidential Source 1 regarding GHAFOURIA DTO**

21.    Confidential Source #1 (hereinafter referred to as CS1) stated he/she is familiar with oxycodone pills and the difference between the different dosages of oxycodone because GHAFOURIA showed him/her what 30mg oxycodone and 80mg OxyContin looked like in case CS1 found additional sources of oxycodone for GHAFOURIA. CS1 is concerned for his/her safety if his/her identity is revealed. Therefore, your Complainant is withholding CS1's identity from this complaint.

22.    CS1 stated that GHAFOURIA normally obtains the oxycodone that he distributes to another state through his own prescriptions. CS1 further stated that GHAFOURIA acquires additional oxycodone from an Asian female who agents have identified as Ki Yong PARKER. GHAFOURIA has told CS1 that he (GHAFOURIA) usually purchases 200 pills (of oxycodone) per month from this Asian female (that agents have identified as Ki Yong PARKER). The sections titled "October 4, 2010 - FBI Surveillance" and "Prescription Monitoring Program - Patient Summary" will discuss PARKER and FBI agents' identification of this Asian female.

23.    CS1 stated another source of oxycodone for GHAFOURIA is a person whom CS1 has and agents have positively identified as Demetha L. Brown JACKSON (JACKSON). CS1 stated that this person (JACKSON) drives a brown colored SUV that appeared to have been in a car accident. CS1 stated this person (JACKSON) collects prescriptions from various sources around Las Vegas and delivers the pills to ALLEY RAT 2 to sell them to GHAFOURIA. CS1 further stated that this person (JACKSON) has traveled to .... (redacted by your Complainant, but CS1 stated the name of another state) to deliver oxycodone for GHAFOURIA. CS1 knows this

information because GHAFOURIA told it to CS1. FBI SA Dunford displayed a driver's license picture of JACKSON to CS1, who immediately identified the person in the picture as the person he/she knows (who supplied oxycodone to GHAFOURIA). JACKSON's activities will be detailed in the section titled "October 4, 2010 - FBI Surveillance".

**November 8, 2009 - Kimberly CRAWFORD interdiction with drug proceeds meant for GHAFOURIA**

24.    On November 8, 2009, a one-way airline ticket was purchased in CRAWFORD's name for $716.70 in cash. The flight was from another state to Las Vegas, NV, via Sea-Tac International Airport, and the ticket was purchased just hours prior to the flight departing. Port of Seattle Police Officer Tyrone Haggin (Officer Haggin) obtained this information and knows from his training and experience that it is common for narcotics couriers to pay full fare with cash on the same day for an airline ticket traveling to drug source cities like Las Vegas, NV. Officer Haggin, along with Seattle Police Department Officer John McCarthy (Officer McCarthy) decided to contact CRAWFORD when she arrived in Seattle, WA. On November 8, 2009, at approximately 5:55 PM, CRAWFORD's Alaskan originated flight arrived at the gate, and at approximately 6:05 PM, CRAWFORD was identified in the seating area. Officer Haggin approached CRAWFORD from behind and showed her his credentials. Officer Haggin advised CRAWFORD he was a police officer. CRAWFORD agreed to talk to Officer Haggin. Officer Haggin stood to the side of CRAWFORD to assure her that she could walk away at anytime. Officer Haggin advised CRAWFORD she was not under arrest and she was free to leave at anytime. Officer Haggin advised CRAWFORD he conducted narcotics investigations at Sea-Tac Airport. Officer Haggin asked CRAWFORD if she had any large amounts of cash or narcotics in her possession. CRAWFORD pointed to her waist and stated that she had cash. Officer Haggin advised CRAWFORD not to take the cash out of her pants while in public view.

.  .  .

25. Officer Haggin asked CRAWFORD if the cash was hers and if she withdrew the cash from a bank. CRAWFORD stated the cash belonged to "clients." CRAWFORD said she was told to pick the cash up in ... (redacted by Complainant, but she stated the name of a city located in another state) and deliver it to Las Vegas. CRAWFORD said she possessed $9,300.00. CRAWFORD agreed to walk up to Port of Seattle Police Department offices located at Sea-Tac Airport and talk about how she had obtained the cash.

26. Once arriving at their destination, CRAWFORD agreed to talk to Officers Haggin and McCarthy about the origin of the cash. CRAWFORD removed the cash from her waist. The cash was secured in two money pouches strapped to her waist.

27. CRAWFORD said the cash belonged to a friend that she identified as "Nick GHAFOURIA", and she stated that he lived in Las Vegas. CRAWFORD stated GHAFOURIA owned a company called NG, Inc. CRAWFORD said that she had known GHAFOURIA for eleven (11) years. CRAWFORD said she did not know GHAFOURIA's phone number or address because she had lost her phone with his phone number in it.

28. CRAWFORD said she had been in ... (redacted by your Complainant but she stated the name of another state) for about twelve days to clear her head after a marriage to a millionaire fell through. CRAWFORD said she was self employed as a writer and a promoter, and the name of her company was Master Pass Key Enterprises. CRAWFORD said she had earned $24,000 in income the prior year and that she was two years behind in paying her income taxes. CRAWFORD believed the cash on her person was generated from ticket proceeds for different events promoted in ... (redacted by your Complainant but she stated a city in another state).

29. CRAWFORD told Officer Haggin that she stayed at the ..... (the location name of the hotel has been redacted by your Complainant) Hilton, and paid cash for her room. CRAWFORD told Officer Haggin that a black male had met her in front of the hotel and given her the cash. CRAWFORD said she did not know the black male's name. CRAWFORD later told

Officer McCarthy that an unknown black male drove her to McDonald's in .... (redacted by your Complainant, but she stated the name of a city in another state), to meet with an unknown white male who gave her the cash. CRAWFORD said she put the cash into the money pouches and the black male dropped her off at the airport to catch her flight. CRAWFORD stated the money was wrapped in rubber bands and that she took the rubber bands off the money and counted it. CRAWFORD stated she did this because she was "responsible" for the money.

30.     At approximately 6:53 PM, Task Force Officer Matt Bruch (TFO Bruch) arrived in the Port of Seattle Police offices with his narcotic canine "Lilly". "Lilly" conducted a sniff of the currency. "Lilly" alerted to the odor of narcotics on the currency.

31.     Officers Haggin, McCarthy and TFO Bruch counted the cash in front of CRAWFORD, and it totaled $10,880.00.

32.     Your Complainant knows from his training and experience that drug traffickers and those who are associated with drug trafficking often use individuals to conceal drug proceeds on their persons when transporting the drug proceeds back to them. This type of money laundering is typically referred to as "bulk cash smuggling." Your Complainant has probable cause to believe that CRAWFORD was attempting to transport drug proceeds from another state to GHAFOURIA in Las Vegas.

33.     Based upon CRAWFORD stating that GHAFOURIA owned a company called NG, Inc., your Complainant conducted a Nevada Secretary of State Database search, and NG, Inc is a revoked status corporation that listed GHAFOURIA as president, treasurer, and secretary. In addition, CRAWFORD stated that the name of her company was "Master Pass Key Enterprises." Your Complainant researched Master Pass Key Enterprises on both Nevada and another state's Secretary of State websites with negative results. Furthermore, your Complainant did not find any business licenses for CRAWFORD and/or Master Pass Key Enterprises in Las Vegas, NV, and another state per their respective business license websites.

15

**May 3, 2010 - FBI Surveillance showing the association between GHAFOURIA and CRAWFORD, and the withdrawal of drug proceeds by GHAFOURIA from a TARGET BANK ACCOUNT**

34.    On May 3, 2010, surveillance agents initiated surveillance on ALLEY RAT 1. The surveillance agents were provided pictures of the individuals in this investigation and their observations listed in the following surveillances are positive identifications of the listed individuals.

35.    At approximately 11:55 AM, SA Russell observed GHAFOURIA arrive at ALLEY RAT 1 in a Mercedes sedan with a temporary license plate.

36.    At approximately 12:30 PM, SA Russell observed CRAWFORD arrive at ALLEY RAT 1 in a black Ford sedan with a Nevada license plate of "149WNS". A Nevada Department of Motor Vehicle (DMV) check revealed that this vehicle was registered to CRAWFORD.

37.    At approximately 12:40 PM, SA Russell observed GHAFOURIA depart ALLEY RAT 1 in a white Cadillac with a personalized Nevada license plate of "HOLYGST". GHAFOURIA arrived at the Wells Fargo Bank branch on 6110 W. Cheyenne, Las Vegas, NV. SA Russell observed that GHAFOURIA made a $1,500 cash withdrawal at teller window number four (4) inside the Wells Fargo Bank. After this transaction, SA Giyan observed GHAFOURIA drive back to ALLEY RAT 1.

38.    As described in this complaint, CRAWFORD was interdicted with $10,880 in cash, and she stated that she was delivering the cash to GHAFOURIA in Las Vegas. Your Complainant has probable cause to believe that GHAFOURIA sent CRAWFORD to another state to have CRAWFORD transport drug proceeds from the sale of oxycodone back to him in Las Vegas.

39.    Your Complainant confirmed from Wells Fargo Bank records that on May 3, 2010, GHAFOURIA withdrew $1,500 cash from ALLEY RAT account X0538. In addition, your

16

Complainant confirmed from Wells Fargo Bank records that a person in another state deposited $5,200 in cash into ALLEY RAT account X0538 on this same day. Your Complainant has probable cause to believe that SA Russell observed GHAFOURIA withdraw drug proceeds that were earned in another state from the sale of oxycodone the same day the person in another state deposited $5,200 in drug proceeds into the same TARGET ACCOUNT.

**September 24, 2010 - FBI Surveillance showing GHAFOURIA leaving his residence, meeting drug source PARKER, and then traveling to ALLEY RAT 2**

40. On September 24, 2010, surveillance agents initiated surveillance at GHAFOURIA's residence at approximately 9:34 AM. At this time, SA Deeb observed GHAFOURIA's Mercedes Benz parked in the driveway of this location.

41. At approximately 12:22 PM, SA Bohn observed GHAFOURIA's Mercedes Benz depart his residence and arrive at "Big O Tires", 3303 S. Jones Blvd., Las Vegas.

42. At approximately 12:23 PM, GHAFOURIA was observed entering the passenger's seat of a white Lincoln Navigator, with a Nevada license plate of "290TJU" that was parked in the lot of the "Big O Tires". SA Bohn observed that in the driver's seat of the Navigator was a woman that appeared to be in her 40's. The vehicle was registered to Ki Y. PARKER, 5425 Palmyra Ave, Las Vegas, NV. Your Complainant knows that CS1 had stated that a person agents identified as PARKER was an oxycodone source for GHAFOURIA, and your Complainant believes that the surveillance agent's description of the female driver of the Navigator was consistent with PARKER's identity.

43. At approximately 12:42 PM, SA Deeb observed GHAFOURIA exit the Navigator and enter his Mercedes Benz and depart the "Big O Tires" parking lot.

44. Based on the details of this surveillance and the information in this complaint, your Complainant has probable cause to believe the meeting between GHAFOURIA and PARKER was for the exchange of oxycodone and/or drug proceeds.

17

**October 4, 2010 - FBI Surveillance showing GHAFOURIA leaving his residence, meeting drug source PARKER at her residence, then driving to ALLEY RAT 2 and meeting drug source JACKSON**

45.    On October 4, 2010, at approximately 10:13 AM, surveillance agents initiated surveillance on GHAFOURIA's residence. At this time, SA Giyan observed GHAFOURIA's Mercedes Benz parked in the driveway of this location.

46.    At approximately 11:26 AM, SA Paholsky observed GHAFOURIA depart his residence.

47.    At approximately 11:38 AM, SA Nevitt and SA Giyan observed GHAFOURIA arrive at PARKER's residence 5425 Palmyra Ave., Las Vegas, NV. GHAFOURIA was not observed entering the residence, but was observed walking from the residence to his vehicle.

48.    At approximately 11:41 AM, SA Paholsky observed GHAFOURIA depart 5425 Palmyra Ave., Las Vegas, NV. SA Paholsky noted that the following vehicles were parked at this residence: a white Lincoln Navigator with a Nevada plate of "290TJU"; and, a black Mercedes Benz with a Nevada plate of "413WWG".

49.    At approximately 12:04 PM, SA Giyan observed GHAFOURIA arrive at ALLEY RAT 2 and he entered the location.

50.    At approximately 2:58 PM, a maroon Chevrolet Blazer, with a Nevada license plate of "321WWU" arrived at ALLEY RAT 2. An African American female exited the vehicle and entered ALLEY RAT 2. This vehicle was registered to Demetha L. Brown JACKSON. SA Bohn observed this and believed the African American female was JACKSON.

51.    At approximately 3:03 PM, SA Bohn observed the person that the agent believed was JACKSON depart ALLEY RAT 2 in her Blazer.

52.    The surveillance noted above that places GHAFOURIA at PARKER's residence and corroborates CS1's statements that one of GHAFOURIA's suppliers for oxycodone is an Asian

18

female whom agents have identified as PARKER. Based on the information in this complaint, your Complainant has probable cause to believe that surveillance agents observed GHAFOURIA meeting PARKER at her residence to either exchange drugs and/or drug proceeds.

53. The surveillance noted above also corroborates CS1's statements that a person whom agents have identified as JACKSON is a source of oxycodone for GHAFOURIA. Based on this information and the information contained in this complaint, your Complainant has probable cause to believe that either drugs or drug proceeds exchanged hands between GHAFOURIA and JACKSON as detailed in this surveillance at ALLEY RAT 2.

**Nevada Prescription Monitoring Program - Patient Summary showing GHAFOURIA and PARKER obtaining large quantities of oxycodone**

54. The Prescription Monitoring Program (PMP) is a searchable database maintained by the State of Nevada that is comprised of prescription information on individuals who have filled prescriptions. The information in the PMP database is supplied by the pharmacies that actually fill the prescriptions. This database can be searched by name and date of birth to acquire prescription histories of individuals.

55.    The PMP database returned a positive hit for PARKER. A summary of the information provided by PMP is as follows:

| Date filled | Mo/Yr | Patient | Amount | Pill Prescribed | Dosage unit | Prescribing Doctor |
|---|---|---|---|---|---|---|
| 09/28/2009 | Sep-09 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 10/27/2009 | Oct-09 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 11/24/2009 | Nov-09 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 12/18/2009 | Dec-09 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 01/13/2010 | Jan-10 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 02/15/2010 | Feb-10 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 03/23/2010 | Mar-10 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 04/14/2010 | Apr-10 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 05/16/2010 | May-10 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 06/16/2010 | Jun-10 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 07/07/2010 | Jul-10 | Ki PARKER | 240 | OxyContin | 80 MG | Maurice Gregory |
| 09/13/2010 | Sep-10 | Ki PARKER | 240 | Oxycodone | 80 MG | Maurice Gregory |

56.    Based on the PMP database search, from September 2009 through October 2010, PARKER obtained approximately 2,880 tablets of oxycodone 80mgs. The 2,880 tablets of oxycodone were obtained during the same time period as the $1.2 million dollars in cash deposits were made into the TARGET BANK ACCOUNTS in another state as detailed in this complaint. In addition, surveillance agents observed GHAFOURIA meet with PARKER on one occasion and observed GHAFOURIA arrive at PARKER's residence on another occasion as detailed in the sections titled "FBI Surveillance - September 24, 2010" and "FBI Surveillance - October 4, 2010." Furthermore, the above information corroborates CS1's information that the Asian female later identified as PARKER is a source of oxycodone for GHAFOURIA. Your Complainant has probable cause to believe that PARKER sold her 80mg OxyContin and oxycodone pills to

20

GHAFOURIA, who then sent them to another state for distribution.

57.     Based on the PMP database search, from June 2009 through October 2010, GHAFOURIA and PARKER obtained 4,425 tablets of oxycodone 80mgs, and 1,860 tablets of oxycodone 30mgs. Your Complainant performed a conservative calculation and has probable cause to believe that GHAFOURIA earned approximately $384,150 from the illegal distribution of oxycodone from the pills acquired by GHAFOURIA and PARKER. Your Complainant arrived at $384,150 by multiplying 4,425 tablets of oxycodone 80mg by $70 which totaled $309,750. Furthermore, your Complainant multiplied 1,860 tablets of oxycodone 30mgs by $40 which totaled $74,400. Your Complainant totaled the amount for the oxycodone 80mgs of $309,750 and the amount for the oxycodone 30mgs of $74,400 and arrived at a total amount earned from the illegal distribution of oxycodone of $384,150.

58.     As detailed in this complaint, approximately $1,221,186 in cash was deposited into the GHAFOURIA associated TARGET BANK ACCOUNTS. Your Complainant has probable cause to believe that if $384,150 in cash deposits came from the sale of oxycodone acquired by GHAFOURIA and PARKER, and that GHAFOURIA had additional sources of oxycodone. CS1 stated that a person agents determined was JACKSON was a source of oxycodone for GHAFOURIA, and your Complainant has probable cause to believe that JACKSON and other unidentified individuals supplied GHAFOURIA oxycodone for distribution in another state.

59.     Your Complainant conducted a financial analysis on records obtained from Wells Fargo Bank. Your Complainant determined that approximately $1,221,186 in cash deposits have been made into nine (9) Las Vegas based Wells Fargo bank accounts (TARGET BANK ACCOUNTS) from approximately July 24, 2009, through October 2, 2010. Most of the cash deposits occurred in another state, and then the cash was withdrawn on the same day in Las Vegas, NV, or shortly after the cash deposit was made in another state.

21

60. The $1,221,186 in cash deposits into the nine (9) TARGET BANK ACCOUNTS from approximately July 24, 2009, through October 2, 2010 were during the same time period that GHAFOURIA and PARKER obtained approximately 1,860 tablets of 30mg oxycodone and 4,425 tablets of 80mg OxyContin as detailed in the "Prescription Monitoring Program - Patient Summary" section above. Based on the information in this complaint, your Complainant has probable cause to believe the oxycodone obtained by GHAFOURIA and PARKER were sold and distributed in another state, and then the drug proceeds were deposited into the nine (9) TARGET BANK ACCOUNTS by co-conspirators in another state.

61. The nine (9) TARGET BANK ACCOUNTS were opened in Las Vegas, NV and are summarized as follows:

| Name on Acct | Type of Acct | Acct#/ Date Opened | Authorized Signers on Acct |
| --- | --- | --- | --- |
| GHAFOURIA | Personal checking | X7063 / 07/16/09 | GHAFOURIA only |
| HILL | Personal checking | X9167 / 09/28/09 | HILL only |
| ARIZA | Personal checking | X8748 / 10/12/09 | ARIZA only |
| STEALTH BOYS | Business checking | X0942 / 10/13/09 | THOMPSON only |
| STEALTH BOYS | Business checking | X7108 / 10/13/09 | THOMPSON only |
| STEALTH BOYS | Business checking | X9848 / 05/04/10 | THOMPSON only |
| ALLEY RAT | Business checking | X0538 / 03/23/10 | GHAFOURIA/POWELL |
| ALLEY RAT | Business checking | X0868 / 03/23/10 | GHAFOURIA/POWELL |
| ALLEY RAT | Business checking | X0939 / 04/01/10 | GHAFOURIA/POWELL |

62. Only the above individuals are authorized to withdraw funds from the TARGET BANK ACCOUNTS. Your Complainant has probable cause to believe that GHAFOURIA conspired with HILL, ARIZA, and THOMPSON to launder drug proceeds from the sale of oxycodone in another state through their corresponding TARGET BANK ACCOUNTS.

. . .

22

63.    As previously stated, from July 24, 2009, through October 2, 2010, the above nine (9) Las Vegas TARGET BANK ACCOUNTS received approximately $1,221,186 in cash deposits. The following is an analysis of the total amount of cash deposited, per TARGET ACCOUNT, in which your Complainant has probable cause to believe the cash deposited represents drug proceeds from the sale of oxycodone in another state:

| Name on Acct | Acct# | Total Cash Deposits |
|---|---|---|
| GHAFOURIA | X7063 | $78,000 |
| HILL | X9167 | $243,792 |
| ARIZA | X8748 | $17,700 |
| STEALTH BOYS | X0942 | $373,874 |
| STEALTH BOYS | X7108 | $42,300 |
| STEALTH BOYS | X9848 | $420,770 |
| ALLEY RAT | X0538 | $31,300 |
| ALLEY RAT | X0868 | $6,450 |
| ALLEY RAT | X0939 | $7,000 |

64.    Your Complainant analyzed the above nine (9) TARGET BANK ACCOUNTS to determine if a legitimate business purpose existed for receiving $1,221,186 in cash deposits from another state.

65.    Your Complainant determined that the Wells Fargo Bank accounts in the name of GHAFOURIA (X7063), HILL (X9167), and ARIZA (X8748) were opened as personal accounts and not business accounts. This means from the onset that GHAFOURIA, HILL, and ARIZA established the bank accounts with no legitimate business purpose. In addition, shortly after opening the bank accounts, cash deposits were made to the bank accounts from another state. GHAFOURIA opened his Wells Fargo Bank account# X7063 in Las Vegas, NV on July 16, 2009, and the first deposit into his bank account from another state occurred on July 24, 2009, that

23

consisted of $2,500 in cash. HILL opened his Wells Fargo Bank account# X9167 in Las Vegas, NV, on September 28, 2009, and a $3,300 cash deposit was made into his Wells Fargo Bank account the same day from another state. ARIZA opened his Wells Fargo Bank account X8748 in Las Vegas, NV, on October 12, 2009, and the first deposit into his bank account from another state occurred on October 16, 2009, which consisted of $3,000 in cash. Furthermore, your Complainant analyzed the transactional history of GHAFOURIA's, HILL's, and ARIZA's bank accounts, and it consisted mostly of deposits of cash from another state and then the withdrawal of cash in Las Vegas. Very few checks were written from these accounts and most debit card purchases consisted of minimal amounts for expenses such as gas, groceries, and food. Based on this analysis, your Complainant has probable cause to believe that GHAFOURIA, HILL, and ARIZA's bank accounts were used and established for the sole purpose of transferring drug proceeds from another state to Las Vegas, NV.

66.     Your Complainant analyzed the Wells Fargo Bank accounts in the name of STEALTH BOYS (STEALTH BOYS, INC) with account numbers X0942, X7108, and X9848. These accounts were opened by THOMPSON. On October 13, 2009, THOMPSON opened Wells Fargo Bank accounts X0942 and X7108 in Las Vegas, NV. This was approximately one day after ARIZA opened his Wells Fargo Bank account X8748 and two weeks after HILL opened his Wells Fargo Bank account X9167. THOMPSON opened Wells Fargo Bank account X9848 in Las Vegas, NV on May 4, 2010. The first cash deposits from another state into Wells Fargo Bank accounts X0942 and X7108 occurred on November 4, 2009 ($6,500), and January 11, 2010 ($4,000), respectively. The first cash deposit from another state into Wells Fargo Bank account X9848 occurred on May 10, 2010, which totaled $4,000. These bank accounts were opened under the corporate name of "STEALTH BOYS, INC", with THOMPSON listed as the secretary of the corporation. STEALTH BOYS, INC's corporate status was revoked by the Nevada Secretary of State on December 1, 2009, for failure to file the Annual List of officers and directors and

24

designation of Registered Agent for the filing period of November 2008 to November 2009. Your Complainant confirmed from Las Vegas city and county websites that STEALTH BOYS never had a valid business license in Las Vegas, NV. Furthermore, your Complainant analyzed the transactional history of STEALTH BOYS accounts X0942, X7108, and X9848 and it consisted mostly of deposits of cash from another state and then the withdrawal of cash in Las Vegas, NV. Very few checks were written from these accounts and most debit card purchases consisted of minimal amounts for expenses such as gas, groceries, and food. Your Complainant knows from his training and experience that drug traffickers often establish nominee corporations in order to conceal and disguise their drug proceeds. By depositing cash into corporate bank accounts, drug traffickers believe they can legitimize the funds by claiming the source of the funds are from corporate business dealings when in reality the funds are drug proceeds. Based on this analysis, your Complainant has probable cause to believe that THOMPSON established the STEALTH BOYS Wells Fargo Bank accounts X0942, X7108, and X9848 for the sole purpose of transferring drug proceeds from another state to Las Vegas, NV.

67.    In order to demonstrate the frequency of the cash deposits made in another state into the Las Vegas based TARGET BANK ACCOUNTS, your Complainant conducted further analysis. Your Complainant determined that approximately three hundred forty five (345) cash deposits have been made into the nine (9) TARGET BANK ACCOUNTS from approximately July 24, 2009, through October 2, 2010. Your Complainant calculated the number of days between July 24, 2009, and October 2, 2010, and the result is approximately four hundred twenty eight (428) days. Wells Fargo Bank branches in the originating state are generally closed on Sundays so your Complainant subtracted out the approximate number of Sundays from July 24, 2009, through October 2, 2010, and it totaled approximately 60 Sundays. Your Complainant subtracted out the approximate number of Sundays (60) from the total days between July 24, 2009, and October 2, 2010 (428), and the result is the total amount of days the Wells Fargo Bank branches would have

been open for business is approximately 368 days. Therefore, approximately 345 cash deposits were made in approximately 368 days, which averages out to be almost a cash deposit being made every day into the Las Vegas TARGET BANK ACCOUNTS. The above analysis is used to establish the fact that cash is frequently being deposited into the TARGET BANK ACCOUNTS in another state. Your Complainant analyzed the actual days in between cash deposits into the TARGET BANK ACCOUNTS in another state and sometimes there are a few days in between cash deposits but on the other hand, some days four (4) or five (5) cash deposits are made into the TARGET BANK ACCOUNTS in the other state on the same day.

68.     Your Complainant analyzed each of the 345 cash deposits made into the Wells Fargo Bank Las Vegas based TARGET BANK ACCOUNTS in the other state and not one single deposit exceeded $10,000. A financial institution is required to file a Currency Transaction Report (CTR) when they engage in any type of transaction involving cash in excess of $10,000. Your Complainant knows from past experience that drug traffickers and those associated with drug traffickers will go to great lengths to avoid having CTRs filed. The primary purpose behind the creation of the CTR was to create a paper trail for cash transactions; a paper trail that can provide incriminating evidence against individuals engaged in the cash-rich business of drug trafficking. In your Complainant's training and experience, individuals involved in drug trafficking often structure deposits in way to not exceed the $10,000 CTR requirement. Drug traffickers often employ various tactics in an effort to avoid the filing of CTRs which include depositing cash at different banks, different bank branches, different bank accounts, and using different individuals to make the cash deposits into the target bank accounts. This is done in an effort to conceal and disguise the ownership, source, and origin of the drug proceeds. In your Complainant's training and experience, numerous co-conspirators are used in an effort to deposit large amounts of drug proceeds into bank accounts and the co-conspirators are fully aware that they are depositing drug proceeds and they are instructed by the drug trafficker to not deposit the drug proceeds in excess of

$10,000 in order to avoid the filing of a CTR for two main reasons. Depositing cash in increments of less than $10,000 is referred to as "structuring" and there are usually two main reasons cash deposits are structured. The first reason is because the funds being structured are from an illegal source (drug trafficking) and the second reason is to avoid taxes. In both instances, the individuals committing the structuring do not want a CTR filed that would alert law enforcement and/or other government agencies as to their cash producing activity which in this case is drug trafficking.

69. Your Complainant has included the following summary that shows an approximate date range of when the cash deposits into the above Las Vegas based TARGET BANK ACCOUNTS started and if appropriate when they ended:

| | | |
|---|---|---|
| GHAFOURIA | X7063 | July 24, 2009 through March 2, 2010 |
| HILL | X9167 | September 28, 2009 through April 9, 2010 |
| ARIZA | X8748 | October 16, 2009 through October 27, 2009 |
| STEALTH BOYS | X0942 | November 4, 2009 through September 7, 2010 |
| STEALTH BOYS | X7108 | January 11, 2010 through February 23, 2010 |
| ALLEY RAT | X0538 | April 30, 2010 through September 21, 2010 |
| STEALTH BOYS | X9848 | May 14, 2010 ongoing through October 2010 |
| ALLEY RAT | X0868 | October 2, 2010 and ongoing |
| ALLEY RAT | X0939 | October 2, 2010 and ongoing |

70. Your Complainant knows from his training and experience that drug traffickers and money launderers continually change bank accounts that laundered funds are deposited into in an effort to thwart law enforcement efforts, and in an effort to further conceal and disguise the true source, location and ownership of the drug proceeds. The changing of bank accounts by the drug traffickers and money launderers is similar to when drug traffickers "drop" their cell phones and obtain new cell phones to prevent law enforcement from listening to their drug conversations. Your Complainant has probable cause to believe that GHAFOURIA directed cash deposits into his

27

corporate ALLEY RAT Wells Fargo Bank accounts because he was attempting to conceal and disguise the source of funds as funds earned from ALLEY RAT instead of the actual source of the funds which is drug trafficking.

## V.

## OCTOBER 28, 2010 ARRESTS AND STATEMENTS



72.

28



73.

74.

29



75.

76.

77.      On October 28, 2010, MCLAUGHLIN was arrested in Las Vegas, NV. MCLAUGHLIN was read his Miranda rights. MCLAUGHLIN waived his rights and agreed to speak with law enforcement. MCLAUGHLIN stated that PARKER had sold oxycodone tablets to GHAFOURIA. MCLAUGHLIN stated he witnessed approximately two drug transactions in which GHAFOURIA gave money to PARKER for oxycodone tablets in Las Vegas, NV.

78.      THOMPSON further stated that in approximately September/October 2009, GHAFOURIA asked him if he wanted to make some money. GHAFOURIA explained to THOMPSON that he could make five percent (5%) of the total amount of deposits if THOMPSON

would open bank accounts at Wells Fargo Bank. GHAFOURIA initially told THOMPSON that he had a business in .... (location redacted by your Complainant), but he didn't want cash deposited into his bank account because he had tax problems with the IRS. GHAFOURIA told THOMPSON the source of the deposits into his bank account would be from GHAFOURIA's rental car business in .... (location redacted by your Complainant). THOMPSON agreed to open bank accounts at Wells Fargo Bank. THOMPSON opened the bank accounts in approximately September/October 2009 in the corporate name "STEALTH BOYS". GHAFOURIA instructed THOMPSON that once a deposit was made into his STEALTH BOYS account, THOMPSON should withdraw the funds and give to GHAFOURIA. THOMPSON stated that GHAFOURIA told him to keep the cash withdrawals under $10,000.

79.    THOMPSON stated that his STEALTH BOYS bank accounts received the majority of its deposits from .... (location redacted by your Complainant). THOMPSON stated that in approximately May or June 2010, GHAFOURIA told him that the actual source of the funds being deposited into the STEALTH BOYS accounts was from the sale of oxycodone in .... (location redacted by your Complainant).

80.    On October 28, 2010, HILL was arrested in Las Vegas, NV. HILL was read his Miranda rights. HILL waived his rights and agreed to speak with law enforcement. HILL stated in approximately September/October 2009, he was approached by A.S., who asked HILL if he wanted to make some money. A.S. explained to HILL that he could make five percent (5%) of the total deposits made to his bank account if he opened up a Wells Fargo Bank account. HILL agreed and opened up a Wells Fargo Bank account. HILL stated that shortly after opening this account, his account received deposits from .... (location redacted by your Complainant). On the first three or four deposits, HILL withdrew the funds and provided them to A.S. After this, A.S. introduced HILL to GHAFOURIA in approximately October 2009. HILL stated that at some point during October 2009, A.S. and GHAFOURIA explained to him that the source of the funds for the

31

deposits into his bank account was from the sale of oxycodone in .... (location redacted by your Complainant).

81.    HILL stated that he approached ARIZA and asked him if he wanted to make some money. HILL explained the agreement that he had with A.S. and GHAFOURIA and told ARIZA he could make five percent (5%) on the total amount of deposits made to his bank account. HILL stated that ARIZA had accompanied him a few times when HILL withdrew money from his account at Wells Fargo Bank and delivered it to GHAFOURIA at his residence or in a shopping center parking lot. ARIZA agreed with HILL's proposition and opened a bank account at Wells Fargo Bank. HILL stated that ARIZA received deposits into his bank account from .... (location redacted by your Complainant) for approximately 2 to 3 weeks. HILL stated that during this time period, he also received deposits from .... (location redacted by your Complainant) into his bank account. HILL stated that on 2 or 3 occasions, he and ARIZA would go together to make cash withdrawals out of their bank accounts and deliver the cash to GHAFOURIA at his residence or in a shopping center parking lot. HILL stated that when he found out the source of the funds was from the sale of oxycodone, he told ARIZA. HILL stated that ARIZA requested that no more deposits from .... (location redacted by your Complainant) be made into his account at this time or shortly after learning this information, but HILL continued to allow deposits to be made to his bank account by an individual in .... (location redacted by your Complainant).

82.    On October 28, 2010, JACKSON was arrested in Las Vegas, NV. JACKSON was read her Miranda rights. JACKSON waived her rights and agreed to speak with law enforcement. JACKSON stated that GHAFOURIA paid for her to travel to ....(location redacted by your Complainant) on two occasions. JACKSON stated she had never been to .... (location redacted by your Complainant) so she asked GHAFOURIA to purchase a flight for her. JACKSON stated the first time she traveled to .... (location redacted by your Complainant) was approximately August 2010, and the second time was in approximately September 2010. On both

occasions, JACKSON stated that ....(name of individual redacted by your Complainant) picked her up at the airport in .... (location redacted by your Complainant). On the first trip, JACKSON stated that .... (name of individual redacted by your Complainant) dropped her off at a hotel in .... (location redacted by your Complainant) and never came back. JACKSON stated that GHAFOURIA had told her that .... (name of individual redacted by your Complainant) wanted to talk to her about something. The second trip, JACKSON stated that after .... (name of individual redacted by your Complainant) picked her up from the airport in .... (location redacted by your Complainant), .... (name of individual redacted by your Complainant) asked JACKSON if she wanted to make $10,000. The person (name of individual redacted by Complainant) explained to JACKSON that if she opened up some bank accounts in .... (location redacted by your Complainant), and deposited $30,000 to $40,000 in cash into these bank accounts, she could earn $10,000. JACKSON said she declined .... (name of individual redacted by your Complainant) offer and flew back to Las Vegas, NV.

83. On October 28, 2010, ARIZA was arrested in Las Vegas, NV. ARIZA was read his Miranda rights. ARIZA waived his rights and agreed to speak with law enforcement. ARIZA stated that on approximately five or ten occasions he accompanied HILL when HILL paid GHAFOURIA cash. ARIZA stated that HILL would withdraw money from his Wells Fargo Bank account and provide the funds to GHAFOURIA. These cash transactions were conducted at restaurants and shopping center parking lots. ARIZA stated that HILL eventually approached him and asked him if he wanted to earn some money. HILL explained to ARIZA that if he opened a Wells Fargo Bank account, he could make $50 per $1,000 of the total amount of deposits into his account. ARIZA agreed and opened a Wells Fargo Bank account. ARIZA stated that shortly after he opened his Wells Fargo Bank account, deposits were made to his account. ARIZA stated that after a deposit was made to his account, GHAFOURIA contacted him and told ARIZA to withdraw the funds, and meet him at a restaurant or parking lot to exchange the funds. ARIZA

33

stated that he overheard GHAFOURIA and HILL referring to "pills" during a conversation at GHAFOURIA's residence. After this conversation, ARIZA inquired with HILL about the details of the conversation and HILL told ARIZA that they were doing something illegal. After learning this, ARIZA requested to HILL that no more deposits be made to his Wells Fargo Bank account. ARIZA stated that this information was learned by him towards the end, or after the last deposit had been made to his Wells Fargo Bank account.

## V.

## CONCLUSION

84.    Based on the foregoing, and on your Complainant's training and experience, your Complainant believes that probable cause exists to believe Nicholas GHAFOURIA, Scott THOMPSON, Kimberly CRAWFORD, Taylor HILL, Jacob MCLAUGHLIN, and Andrey ARIZA, have violated Title 18, United States Code, Section 1956(h) - Conspiracy to Launder Monetary Instruments.

85.    Based on the foregoing, and on your Complainant's training and experience, your Complainant believes that probable cause exists to believe Nicholas GHAFOURIA, Scott THOMPSON, Kimberly CRAWFORD, Ki Yong PARKER, Demetha L. Brown JACKSON, and Jacob MCLAUGHLIN have violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and 846 - Conspiracy to distribute Oxycodone.

/s/

Christian Mickelsen, Special Agent
Internal Revenue Service - Criminal
Investigation

SUBSCRIBED and SWORN to before me,
this ___29___ day of October, 2010

I attest and certify on __10/29/10__ that this is a full true and correct copy of the original document.

PEGGY A. LEEN

_____
UNITED STATES MAGISTRATE JUDGE

PEGGY A. LEEN
U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

34    By _____ ___Deputy
                      X Secretary

EXHIBIT 1

## SUMMARY OF MONTHLY CASH DEPOSITS VS. MONTHLY ACQUIRED PRESCRIPTION PILLS



Case 2:10-cr-00547-RFB-PAL   Document 696   Filed 10/29/10   Page 36 of 36